UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

    -   against   -                    **MEMORANDUM & ORDER**
                                                  14-CR-0346 (MKB)

ROAN MCLEAN WILSON,

                                 Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Defendant Roan McLean Wilson is charged in a two-count indictment with importation of cocaine in violation of Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(3), and possession of cocaine with intent to distribute in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  On September 15, 2014, Defendant moved to suppress statements he made to law enforcement agents on May 20, 2014.  The Court held a suppression hearing on December 11, 2014.  For the reasons discussed below, the Court denies Defendant's motion.

    **I.**    **Background**

        **a.**    **Facts alleged in the Complaint**

      According to the facts alleged in the Complaint filed on May 20, 2014, on or about May 20, 2014, Defendant arrived at John F. Kennedy International Airport in Queens, New York ("JFK Airport") from Panama City, Panama.  (Compl. ¶ 1.)  Upon his arrival at customs, Defendant was selected for a United States Customs and Border Protection ("CBP") examination.  (*Id.* ¶ 2.)  He presented two black "Alta" bags to CBP and answered standard CBP examination questions.  (*Id.*)  Defendant stated that he owned both suitcases and all of their contents.  (*Id.*)

During the luggage inspection, CBP officers found six baby powder containers; two in one of the bags and four in the other. (*Id.*) The bottles were opened and found to contain packages filled with a white substance. (*Id.*) The substance field-tested positive for cocaine. (*Id.*) Around the time of the field-testing, Defendant stated that it was the first time he had "done this." (*Id.*) Altogether, approximately 1750.1 grams of cocaine was removed from the packages in the baby powder bottles. (*Id.* ¶ 3.) In addition to the cocaine, counterfeit United States currency was also discovered and seized by Secret Service agents. (*Id.* ¶ 4.)

### b. Motion to Suppress

On September 15, 2014, Defendant moved to suppress all statements made to law enforcement agents on May 20, 2014, on the grounds that the statements (1) were not the product of a knowing and intelligent waiver of Defendant's rights guaranteed by the Fifth Amendment, and (2) were not voluntary. (Def. Mot. to Suppress Statements dated Sept. 15, 2014 ("Mot. to Suppress") at 1, Docket Entry No. 13.) Defendant requested an evidentiary hearing, which was held on December 11, 2014.

### i. Defendant's motion

In his motion, Defendant argues that the statements obtained during the May 20, 2014 CBP examination are the product of a custodial interrogation and should be suppressed because the government did not obtain a knowing and intelligent *Miranda* waiver before interrogating him. (Mot. to Suppress 5.) In Defendant's declaration in support of his motion, he states that upon landing at JFK Airport, he proceeded to the customs area, where an officer approached him. (Def. Decl. in Support of Mot. to Suppress Statements ("Def. Decl.") ¶ 3, Docket Entry No. 13-1.) He was directed to bring his luggage to an inspection area, with large tables. (*Id.*) A CBP Officer searched the luggage that Defendant had been carrying, and cut open a bottle of

baby powder. (*Id.* ¶ 4; Mot. to Suppress 3–4.) The CBP Officer "called for backup." (Def. Decl. ¶ 4.) At that time, "[a] number of other officers then approached [Defendant] and ordered [him] to put [his] hands behind [his] back." (*Id.*) The officers escorted Defendant to a small room with a table and a bench, and no windows. (*Id.* ¶ 5.) Defendant was ordered against the wall, searched, and ordered to remove his jewelry. (*Id.*) He was then handcuffed and directed to sit on the bench. (*Id.*) As he sat on the bench, "more than six officers entered and exited the room," to congratulate the officer who arrested Defendant and to take photographs of the luggage he had been carrying. (*Id.* ¶ 6.)

Defendant was questioned while he sat on the bench, and "told [] that I was in a lot of trouble for importing drugs. They claimed that I had done this before. The officers told me that I could avoid a lengthy jail sentence by confessing to importing drugs and by telling them who else was involved." (*Id.* ¶ 7.) Despite his "attempt[] to remain silent," the officers continued to ask him questions, which he ultimately answered. (Def. Decl. ¶¶ 7–9; *see* Mot. to Suppress 4.) "After what seemed like two hours," two Homeland Security Investigations ("HSI") agents entered the room. (Def. Decl. ¶ 8.) The agents informed Defendant of his *Miranda* rights, at which point Defendant requested an attorney. (*Id.*)

### ii. Government's response in opposition to the motion

The government argues that Defendant's statements were not the product of a custodial interrogation and thus did not require prophylactic *Miranda* warnings, and that Defendant's motion should be denied without a hearing. (Gov. Opp'n to Def. Mot. to Suppress Statements ("Gov. Opp'n") 5–12.) The government further argues that Defendant's statements were voluntary, and thus admissible. (*Id.* 12–15.)

### c. December 11, 2014 Suppression Hearing

On December 11, 2014, the Court heard testimony from Yolanda Reyes, an officer with CBP and a member of the Passenger Enforcement Roving Team ("PERT") at JFK Airport, Francisco Ramos, an officer with CBP and team leader on the PERT, James Bowles, a supervisory officer with CBP, and Derek Bergman, an agent with HSI (Tr. of Suppression Hr'g ("Tr."), dated December 11, 2014, 4:17–5:21, 42:1–43:9, 64:3–4, 119:21–120:7, 131:2–11.) Each testified about the events immediately preceding and following Defendant's arrest on May 20, 2014. Based on the evidence presented, the Court makes the following findings of fact.

### i. Luggage inspection

On May 20, 2014, Defendant arrived at JFK Airport and proceeded to the baggage carousel in Terminal Four, where he retrieved two large pieces of luggage. (Tr. 9:8–11:22.) Officer Reyes was on duty to monitor the baggage carousel at the time. (Tr. 10:8–16.) Officer Reyes approached Defendant, and Defendant provided her with his Customs declaration, a passport and a legal permanent residency card. (Tr. 10:14–22.) Officer Reyes asked Defendant where he was coming from and how long he had been away. (Tr. 11:1–6.) She also asked whether the bags he was carrying were his, whether he packed them himself, and whether everything in the bags was his; Defendant answered yes to each question. (Tr. 11:10–14, 28:12−15.) Officer Reyes directed Defendant to the luggage "belts," tables which facilitate the primary screening process. (Tr. 11:25–12:1.) Defendant put his two large suitcases and two pieces of carry-on luggage on the table and opened them. (Tr. 11:21–12:5, 27:19–23.) Officer Reyes asked for and inspected Defendant's passport. (Tr. 12:5–9.) She then asked Defendant what the purpose of his trip outside the country was. (*Id.*) At the hearing, Officer Reyes did not indicate whether Defendant responded.

Officer Reyes began to inspect Defendant's luggage. She unzipped one of the larger suitcases, in which she found a pair of cowboy boots. (Tr. 12:10–21.) In each boot was a baby powder bottle. (*Id.*) Officer Reyes then unzipped the second larger suitcase, in which she found two additional pairs of cowboy boots, again with one baby powder bottle in each boot. (Tr. 12:22–13:2.) Officer Reyes questioned why Defendant needed six bottles of baby powder, and he indicated that the baby powder was to prevent damage to his boots during transport. (Tr. 13:5–9, 28:3–7.) Officer Reyes then informed Defendant that she would open one of the bottles. (Tr. 13:11–12.) She pried open the top of one with a metal probe, similar to a screwdriver, and poured its contents into a clear plastic bag. (Tr. 13:11–14, 28:19–29:4, 39:10–22.) Officer Reyes noted that along with white powder, the bottle contained small balloons that also appeared to contain a powdery substance. (Tr. 13:11–14, 29:5–8.) She asked Defendant, "what's this?" (Tr. 13:15–17, 29:12–13.) Defendant did not respond. (Tr. 29:12–17.)

Upon noting the balloons in the baby powder bottle, Officer Reyes instructed Defendant to put his arms behind his back. (Tr. 13:23–24.) She reached across the table and grabbed Defendant's upper arm, and called Officer Ramos's name. (Tr. 13:23–14:1, 30:12–15.) Officer Ramos also recalled hearing her say, "we're in."[1] (Tr. 46:10–13.) When she had Officer Ramos's attention, she wordlessly held the bottle of baby powder and demonstrated toward Defendant. (Tr. 30:17–24.) Officer Ramos approached the table and grasped Defendant's upper arm. (Tr. 14:3–4, 31:21–23, 46:12–13.) Officer Reyes repacked the luggage, and Officer Ramos escorted Defendant to a secure, private screening area. (Tr. 14:3–24, 47:18–21.) Defendant was

---

[1] Officer Ramos testified that he understood "we're in" to mean that Officer Reyes had found contraband. (Tr. 64:5–25.) Officer Ramos explained that the PERT at JFK occasionally used "we're in" as a sort of code to indicate suspected contraband. (Tr. 65:8–66:10.) The officers use code because they "don't want to arouse the person . . . [or] have them take off." (Tr. 65:21–66:6.)

not in handcuffs at the time.  (Tr. 14:19–21.)

Once she was finished packing the luggage, Officer Reyes proceeded to the private screening area.  (Tr. 15:2–11.)  When she arrived, the doors to the screening room were closed, and Officer Reyes assumed that it was because Officer Ramos and Officer Bowles were conducting a pat-down search.  (Tr. 15:2–11, 16:4–10.)  Once the doors opened, Officer Reyes entered the room and left the door to the room open.  (Tr. 16:15–17.)

### ii.    Private screening room inspection

Officer Ramos escorted Defendant away from the luggage belt toward the private screening room by himself, holding Defendant by the armpit or tricep with one hand and the wrist with the other.[2]  (Tr. 46:17–22, 67:5–9.)  On the way to the private screening area, Officer Ramos called to Officer Bowles, a nearby supervisor, and requested he accompany them.  (Tr. 46:23–47:11, 70:6–12.)  Officers Ramos and Bowles both testified that it was their typical practice for two officers to accompany anyone to the private screening area, in order to ensure officer safety.  (Tr. 70:6–22, 120:25–121:11.)  Officer Bowles did not touch Defendant at this time, and met Officer Ramos and Defendant at the doors to the private search area.  (Tr. 46:23−47:11.)  Both officers were armed with a baton and a gun, though each kept his weapons in their holsters.  (Tr. 21:13–15; 71:20–72:7.)

Defendant was walked through locked doors, into a small room with no windows and one door.  (Tr. 15:14, 32:16–22.)  He and the two officers entered the approximately 10-foot-by-10-foot room.  (Tr. 71:13–18.)  On the left of the entrance was a luggage table, and against the opposite wall was a small bench.  (Tr. 15:14–16:3, 47:25–48:5.)  Once Defendant and the two

---

[2]  When asked if this was to prevent Defendant from running away and to be mindful of officer safety, Officer Ramos replied "yes."  (Tr. 66:18–67:4, 68:2–4.)

officers were all inside the room, one of the officers closed the door for privacy. (Tr. 48:6–13, 121:20–25.) For approximately one to two minutes, Officer Ramos and Officer Bowles conducted a pat-down of Defendant. (Tr. 33:23–34:12, 48:16–21.) Defendant was instructed to empty his pockets, turn and put his hands on the wall. (Tr. 48:16–19, 73:15–74:5, 122:6–11.) He was instructed not to move during the search, but was not handcuffed. (Tr. 50:22–51:5, 74:6–10.) Officer Ramos conducted a physical pat-down search, searching Defendant's clothing and waistband. (Tr. 50:7–10, 76:11–24.) Officer Bowles stood behind Officer Ramos. (Tr. 51:9–11, 122:19–21.) Officer Bowles did not touch Defendant, but was standing close enough to reach Defendant. (Tr. 122:19–123:1.) At this time, Defendant said nothing to either Officer, and the Officers did not say anything to each other. (Tr. 51:6–20.) Neither Officer could recall asking Defendant questions such as whether he was traveling by himself, if he was carrying drugs for himself or someone else, or if he had a cellular telephone. (Tr. 81:10–82:22, 123:5−13.) Officer Ramos testified that it was his typical practice to ask a person in Defendant's position if he was traveling with someone else, but said he did not recall asking it on this occasion. (Tr. 82:19–25.) Officer Bowles testified that the only questions typically asked during a pat-down would include biological or medical information. (Tr. 123:14–25.)

Defendant was directed to sit, with his back to the wall, on a bench that contained handcuffs on either side. (Tr. 51:24–52:5, 77:19–24, 78:12–13.) Defendant was not immediately handcuffed, nor was he shackled to the bench. (Tr. 52:6–9, 78:8–16.) Officer Ramos opened the door and Officer Reyes entered, leaving the door open. (Tr. 52:13–16, 77:19−78:2.) Shortly thereafter, Officer Bowles left the room.[3] Although all three officers were

---

[3] Officer Bowles had no particular recollection as to when he left the room, but Officer Ramos did not recall Officer Bowles being in the room at the time the drugs tested positive for

carrying firearms, they did not draw their weapons at any time. (Tr. 21:9–21:15, 57:18–25.) Throughout the time Defendant was in the private screening room, prior to Defendant's arrest, Officers Bowles, Ramos and Reyes were the only CBP officers present. (Tr. 20:19–21:8.)

When Officer Reyes entered the room, Officers Reyes and Ramos stood near the luggage table, across the room from Defendant. Officer Reyes placed Defendant's luggage, passport, and customs form on the table, and placed the baby powder bottle on the table. (Tr. 17:1–4, 52:17–24.) Officer Reyes cut open the bottle, removed a balloon from inside of it, and cut open the balloon. (Tr. 17:5–10.) She placed the powder from inside the balloon in the first drug-testing kit, which tested positive for the presence of narcotics. (Tr. 17:7–19.) She then placed a sample of the same powder in a second drug testing kit, which tested positive for the presence of cocaine. (*Id.*) In total, this process took approximately sixteen minutes. (Tr. 56:5–11.)

At or around the time of the drug testing, approximately six to ten minutes after Officer Reyes had entered the room,[4] Officers Reyes and Ramos inspected Defendant's passport near the luggage table. (Tr. 54:3–11.) Officer Ramos was standing to the side of the table, with his back toward Defendant, who was still sitting on the bench.[5] (Tr. 54:3–21, 55:1–6.) Officer Ramos made a comment to Officer Reyes regarding the number of stamps on Defendant's passport, and

---

cocaine. (Tr. 55:4–18.) Officer Bowles testified that it was his typical practice to leave and return to his office once a "personal search" or pat-down, has been completed. (Tr. 125:4–9.)

[4] Officer Reyes testified that she confirmed the substance was cocaine, and placed Defendant under arrest, approximately six to ten minutes after she entered the room. (Tr. 20:4−18.) Using the "151" form he prepared following the Defendant's arrest, Officer Ramos testified that they entered the room at 5:50, finished the pat-down at 5:51, (Tr. 49:4−50:21), and that the positive test was at 6:05, (Tr. 53:16−54:2).

[5] Officer Ramos clarified that he was comfortable turning his back to an unhandcuffed suspect in a room with the door open because the Defendant was "compliant the whole time, and I was there just at the table while they do the testing." (Tr. 95:16−10.)

suggested that Defendant must have made a number of trips in the past.[6]  (Tr. 19:6–16, 35:19−36:6, 54:3–11.)  Officer Ramos also recalls suggesting to Officer Reyes that "This can't be [Defendant's] first time doing this."  (Tr. 54:7–18; Tr. 85:22–25 ("something to the effect that this is not his first time with this many trips."))  Officer Ramos meant to imply that it was not Defendant's first time smuggling drugs.  (Tr. 86:1–7.)  After hearing that comment, Defendant stated that it was his "first time" ("Pre-Arrest Statement").  (Tr. 17:22–23, 18:19–19:16, 55:1–9.)

Prior to Defendant's Pre-Arrest Statement, Officer Reyes could not recall any officer having asked Defendant any questions outside of those asked during primary screening.  (Tr. 35:16–18.)  Officers Ramos and Reyes both testified that Defendant was not asked about his name or identification on his passport, was not asked about drugs, was not questioned about the baby powder, and was otherwise not subject to direct questioning.[7]  (Tr. 21:16–22:3, 56:21−57:17.)

### iii.   Arrest and luggage inventory

After approximately 16 minutes in the pat-down room, shortly following the Pre-Arrest Statement, Officer Reyes confirmed that the substance in Defendant's bag tested positive for cocaine and informed Defendant that he was under arrest for the importation of narcotics into the United States.  (Tr. 20:4–18, 55:21−56:17.)  She did not Mirandize him, nor anyone else read *Miranda* warnings to him at that time.  (Tr. 22:4–9, 58:10–13.)  Defendant was handcuffed and

---

[6]  Officer Ramos testified that it is his typical practice, if he "see[s] there's a lot of travel, [to] ask [passengers] the purpose of their trips, why they're traveling so often."  (Tr. 44:8–10.)

[7]  As discussed below, Officer Ramos later reported to Agent Bergman that he had asked Defendant how Defendant could have afforded so many trips.  (Tr. 88:11–19.)  At the hearing, Officer Ramos was unable to explain why he reported this to Agent Bergman, and maintained that he never directly questioned Defendant.  (Tr. 112:1–113:23.)

directed to sit back on the bench, and told that a Special Agent would come speak to him. (Tr. 20:9–13.)

Defendant was asked to remove his jewelry after he was placed under arrest, for the purposes of inventory. (Tr. 22:10–17, 58:14–21.) Officer Reyes proceeded to inventory Defendant's belongings, and Officer Ramos remained in the room. While she was going through his luggage, Defendant asked her not to mix his clean clothes with his dirty clothes.[8] (Tr. 23:7–21.) As part of the inventory, Officer Reyes opened Defendant's wallet and began to count the bills inside, so she could report the amount collected on her inventory form. (Tr. 24:3–7.) Officer Reyes observed what she believed to be counterfeit bills, and said to Officer Ramos, "this is counterfeit," in such a way that Defendant could hear her. (Tr. 24:3–10, 36:10–16.) Officer Reyes testified that she did not ask Defendant any questions at this time,[9] but Defendant told Officer Reyes that he had purchased something abroad and received those bills as change ("Post-Arrest Statement"). (*Id.*) Officer Ramos did not recall Defendant saying anything about counterfeit currency. (Tr. 59:10–12.)

After he was placed under arrest, other officers came a few feet into the private screening room to examine the method by which the cocaine had been concealed in Defendants' luggage. (Tr. 22:22–23:6, 59:1–9.) One of the CBP officers congratulated Officer Reyes on finding concealed narcotics. (Tr. 24:23–25:2, 59:25–60:7.) Officer Reyes was also instructed to take photographs of the luggage, cowboy boots and baby powder bottles to document the concealment method. (Tr. 25:9–19.) During this time, Defendant did not say anything, and no

---

[8] Defendant conceded at oral argument that he does not seek to suppress this statement. (Tr. 188:1–17.)

[9] As discussed below, Agent Bergman's report conflicts with this testimony.

one said anything to Defendant regarding a jail sentence, confessing, or cooperation with law enforcement. (Tr. 24:17–22, 25:20–26:8, 59:13–24, 60:23–61:3.)

Eventually, agents from HSI, including Agent Bergman, collected the evidence and Defendant. (Tr. 61:18–24.) Approximately one and a half hours following the arrest, Agent Bergman spoke with Officer Ramos regarding the events of the day. (Tr. 86:8–88:10.) Officer Ramos conveyed Defendant's Pre-Arrest and Post-Arrest Statements to Agent Bergman, but also communicated to Agent Bergman that Defendant had made the Pre-Arrest Statement in response to Officer Ramos having *asked Defendant* how Defendant could have afforded so many trips, and suggesting to Defendant that Defendant must have done this (meaning, smuggled drugs) before. (Tr. 88:11–23.) Officer Ramos also testified that he told Agent Bergman that he had *asked* Defendant about the money, and in response to his question Defendant answered that he had received it abroad. (Tr. 88:20–89:2.) Officer Ramos could not recall why he told Agent Bergman that he had asked Defendant questions on the day of the arrest, and maintained at the hearing that he only exchanged comments with Officer Reyes, and never directed any questions toward Defendant. (Tr. 112:1–113:23.)

Agent Bergman's notes, drafted close in time to his conversation with Officer Ramos, also reflect that Defendant was questioned about how he could have afforded so many trips, although Agent Bergman testified that his notes were not intended to be a verbatim reflection of his conversation with Officer Ramos. (Tr. 144:10–25.) Agent Bergman explained that as he was taking notes, he was focused on capturing what Defendant had said, and not on what Officer Ramos communicated that he, Officer Ramos, had said to Defendant. (*Id.*) Agent Bergman's report, drafted on May 22, 2014 and based on his notes, also indicated that Defendant was *asked* by CBP officers how he was able to afford so many trips and told he must have done this

previously.  (Def. Ex. B at 4.)  The report also indicates that Defendant was "asked by CBP officers how he came to be in possession of this counterfeit money . . . ."  (*Id.* at 5.)  His notes, taken in later interviews with the CBP officers, also indicate that Defendant was "quiet" and "answered questions."  (Tr. 139:3–142:6.)

## II.  Discussion

### a.  Custodial interrogation

Defendant argues that he was subject to custodial interrogation in the private screening room on May 20, 2014, and therefore his statements made inside the room prior to a *Miranda* warning are inadmissible.[10]  The government concedes that Defendant was not advised of his *Miranda* rights prior to the arrival of HSI agents, but argues that under the circumstances, Defendant was not subject to custodial interrogation and therefore a *Miranda* warning was not required.  For the reasons stated below, the Court finds that Defendant was not subject to custodial interrogation in the private screening room.

"In *Miranda v. Arizona*, the Supreme Court held that the 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'"  *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).  As a procedural safeguard, the Supreme Court established the now familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination."  *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)).  "The purpose of the Miranda warning is to ensure that the person in

---

[10]  Defendant does not challenge his statements made to Officer Reyes at the luggage belts, outside the private search area.

custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (citing *Miranda*, 384 U.S. at 444–45 and *Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir. 1988)). However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011); *Donelli*, 588 F.3d at 155 ("*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" (quoting *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004))).

Determining custodial interrogation involves "two parts: (a) there must be an interrogation of the defendant, and (b) it must be while [the defendant] is in 'custody.'" *FNU LNU*, 653 F.3d at 148 (citing *Cruz v. Miller*, 255 F.3d 77, 80–81 (2d Cir. 2001)). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' herself to be 'subjected to restraints comparable to those associated with a formal arrest.'" *FNU LNU*, 653 F.3d at 153 (alterations in original) (quoting *Donelli*, 588 F.3d at 155).

On a motion to suppress in a criminal trial, the defendant bears the burden of demonstrating the basis for the motion — in this case, that he was subject to custodial interrogation. *United States v. Funaro*, 253 F. Supp. 2d 286, 293–94 (D. Conn. 2003) (citing

*United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967)); *United States v. Chin*, No. 13-CR-0028, 2013 WL 5406239, at *9 (D. Vt. Sept. 26, 2013) ("A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." (citations omitted)); *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). Once a basis has been established, "the prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his Miranda rights, and that his confession is truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)).

### i. Pre-Arrest Statement was not the product of custodial interrogation

The government asserts that Defendant was not in "custody" for the approximately fifteen minutes he was in the private search room prior to arrest — that is, that a reasonable person in Defendant's position would not have considered himself subject to restraints approximating a formal arrest prior to his actual formal arrest. *See Acosta*, 575 F.3d at 189 (quoting *Innis*, 446 U.S. at 301). Defendant argues that he was subject to circumstances under which "no reasonable person would believe that they were free to terminate the questioning and go about their way." (Mot. to Suppress 6.)

"The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670; *see also FNU LNU*, 653 F.3d at 153. The "ultimate inquiry" for determining *Miranda* custody is whether a reasonable person in Defendant's position would have considered himself subject to a restraint on freedom of the degree associated with formal arrest. *See Newton*, 369 F.3d at 670 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). In assessing whether one was in "custody," courts examine the totality of the circumstances, including "the interrogation's duration; its location (e.g., at the

suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (citations omitted); *United States v. Broughton*, --- F. App'x ---, ---, 2015 WL 234231, at *2 (2d Cir. Jan. 20, 2015) (To determine whether a suspect is in "custody" for the purposes of *Miranda*, a court must examine the totality of the circumstances and determine whether, given those circumstances, a reasonable person would have felt "at liberty to terminate the interrogation and leave." (quoting *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (per curiam))). An additional relevant factor, "especially so in border situations, [is] the nature of the questions asked." *FNU LNU*, 653 F.3d at 153 (citing *United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003)); *see also United States v. Rijo-Carrion*, No. 11-CR-0784, 2012 WL 6617388, at *3 (E.D.N.Y. Dec. 19, 2012) (noting that persons at the border should reasonably expect some constraints and questions regarding identity and admissibility into the United States) (citing *FNU LNU*, 653 F.3d at 153–55). However, there is no broad "border exception" to *Miranda*'s requirements. *FNU LNU*, 653 F.3d at 148–52.

Defendant was physically removed from the public screening area and escorted to a separate, private screening room. Defendant was briefly patted down and then directed to sit on a bench with his back to the wall, where he remained for approximately fifteen minutes until he was arrested. Under the totality of the circumstances, what transpired in those fifteen minutes did not render Defendant in "custody," warranting *Miranda* warnings. As Defendant points out, there are a number of circumstances which weigh in favor of finding custody: Officer Ramos did grab Defendant's arm and physically remove him to the private search area, where Defendant was told to put his hands against the wall and not to move for approximately two minutes;

Defendant was directed to sit on a bench in the room as Officers Ramos and Reyes proceeded to drug-test a substance in his luggage, likely indicating to Defendant that he was suspected of something. Defendant was not informed that he was free to leave, and was not told that he need not answer any questions. In fact, Officer Ramos had Defendant's passport in his hands, indicating that Defendant was probably not free to leave at the time.

However, other factors weigh against finding that Defendant was in custody in the private screening room, that is, restrained to the degree typically associated with formal arrest. Except for the two minutes the door was closed for privacy as Officer Ramos patted down Defendant to confirm he had no weapons, the door in the room remained open. Defendant was not restrained or held at any time, and only directed not to move during the pat-down for officer safety. *See United States v. Falso*, 293 F. App'x 838, 839 (2d Cir. 2008) (finding that defendant who was interviewed in his home was not in custody for *Miranda* purposes, even though he was asked not to make sudden movements, told not to wash dishes because of a knife in the sink, and told to remain seated during the interview, because "these were reasonable requests to maintain a safe environment for the ongoing search, and did not on balance result in a custodial situation" (citing *Badmus*, 325 F.3d at 138)). For the short period of time prior to Defendant's arrest, lasting approximately fifteen minutes, only two CBP officers were in the room with him, meaning the atmosphere was not significantly "police dominated." *See United States v. Casanova*, No. 11-CR-0562, 2012 WL 760308, at *5 (S.D.N.Y. Mar. 8, 2012) (finding that two defendants who were led by four DEA agents from one end of parking lot to another, such that defendants had their back to a large container or dumpster, so the DEA agents could question defendants about narcotics investigation for a brief period of time, were not in custody). Defendant's reliance on *United States v. Carr*, --- F. Supp. 3d ---, 2014 WL 6673842 (E.D.N.Y. Nov. 24, 2014) is

unavailing.  In *Carr*, the defendant was escorted by four armed officers to a similar private screening room, where he was directed to sit on a bench with his back to the wall while three of the four officers surrounded him, and repeatedly asked questions about his behavior related to drug smuggling.  *Carr*, --- F. Supp. 3d at ---, 2014 WL 6673842, at *6–7.  Here, Defendant was accompanied by only two CBP officers, which is the usual minimum permitted to be alone in a room with an individual at any time, for the purpose of officer safety.  Additionally, while the officers were armed, for at least part of the time he was in the private search room, Officer Ramos stood with his back to Defendant, both officers stood across the room, and neither drew their weapons at any point or made any other show of force.  *See Chin*, 2013 WL 5406239, at *11–12  (concluding that defendant was not in custody and no *Miranda* warnings were required, noting, *inter alia*, that "[t]he officers did not draw their weapons, and they did not advise Defendant that he was not free to leave or under arrest" (citing *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992)) (internal footnote call omitted)); *United States v. Reyes*, No. 11-CR-058, 2012 WL 363042, at *7 (S.D.N.Y. Feb. 1, 2012) (finding defendant not in custody when "the questioning took place on a public street; no guns were drawn; no physical restraints were used, apart from the brief frisk; and only two of the agents actually asked [defendant] questions").  Finally, Defendant was not placed in handcuffs, which are the "hallmark" of formal arrest, until he was actually formally arrested.  *See Newton*, 369 F.3d at 676.

Defendant argues that "questioning" Defendant prior to arrest and confronting him with evidence of criminal culpability distinguishes this case from a routine border screening and makes the circumstances under which Defendant was held akin to formal arrest.  (Def. Reply Mem. 7–8.)  Merely testing powder found in Defendant's luggage for the presence of narcotics in Defendant's presence does not transform this otherwise noncustodial situation into a custodial

one. *See Broughton*, --- F. App'x at ---, 2015 WL 234231, at *2–3 (finding that single CBP officer's escorting defendant to private screening area at JFK Airport, without placing her in handcuffs, to field-test white powdery substance found in luggage was not custodial until defendant was placed under arrest). In addition, even accepting that Defendant was questioned, the nature of the questions asked by the CBP officers do not support a finding that Defendant was in custody at the time he was placed in the pat-down room. *See FNU LNU*, 653 F.3d at 153. Defendant asserts in his declaration that he was told he was in a lot of trouble for importing drugs, that the officers told him he had done this before, and that he was told he could avoid a lengthy jail sentence by confessing and telling the officers who else was involved. (Def. Decl. ¶ 7.) The testimony does not support Defendant's assertions and, to the extent discussed below, the Court credits the CBP officers' testimony that Defendant was not threatened with a lengthy jail sentence, told he was in a lot of trouble, or asked to confess.

Officer Reyes testified that Officer Ramos commented, to her, that Defendant had a number of stamps in his passport, and Officer Ramos testified that he suggested to Officer Reyes that Defendant must have smuggled drugs in the past. This testimony conflicts with documentary evidence made more closely in time to the events of May 20, 2014, which suggests that Officer Ramos asked Defendant how he could afford so many trips, and indicated to Defendant that he must have smuggled drugs before. Although Officer Ramos's explanation of this inconsistency was not entirely convincing, and Officer Reyes's "corroboration" of the exchange was based on her own incomplete memory of the day, even if Officer Ramos did ask Defendant how he could afford so many trips and suggested — either to Officer Reyes or to Defendant himself — that Defendant must have "done this" before, that single question and accompanying implication alone is not sufficient to transform this situation into a custodial one.

While not necessarily the type of question a reasonable traveler might expect at the border, *see FNU LNU*, 653 F.3d at 153–54 ("[A] reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on."), the nature of this question, in these circumstances, does not tip the scales toward a finding that a reasonable person in Defendant's shoes would have felt restraint to the same degree associated with formal arrest, as the question itself did not suggest to Defendant that he was already under arrest. *See United States v. Lifshitz*, No. 03-CR-0572, 2004 WL 2072468, at *7 (S.D.N.Y. Sept. 15, 2004) (finding no custody when defendant, interviewed in his living room, was posed with questioning that was not "threatening or confrontational"); *cf. Badmus*, 325 F.3d at 138 (custody turns in part on whether "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." (internal quotation marks and citation omitted)). *But cf. United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995) (remanding to determine if, when defendant was asked to step away from boarding area at airport, had his travel documents confiscated, and was surrounded by seven officers who asked "questions [which] suggested that the officers already knew [defendant] had weapons in his baggage and that they were not about to let him go at all," he was in custody), *as amended on denial of reh'g* (Jan. 9, 1996), *on reh'g*, 86 F.3d 275 (2d Cir. 1996) (finding defendant was in custody); *United States v. Molina-Gomez*, 781 F.3d 13, 22–23 (1st Cir. 2015) (finding that defendant detained for one-and-a-half to two hours in ten-by-ten secondary inspection room in customs, when faced with "probing questions about potential illegal activity" beyond admissibility into the United States, was in custody for *Miranda* purposes).

Furthermore, the Officers testified that Defendant was not asked any other questions prior to his arrest, aside from those routine questions Officer Reyes asked him at the luggage belt. A

reasonable individual may expect a brief detention at the border and some questions about his or her personal information and travel, such as those posed to Defendant from Officer Reyes at the luggage belt. *See FNU LNU*, 653 F.3d at 155; *United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013) (questions regarding admissibility of defendant into the United States did not render secondary inspection at border custodial). A reasonable person in Defendant's position, given the manner in which he was escorted to the private screening room, the atmosphere in the room and the nature of the comments and questions he encountered in his interaction with the CBP officers, would not be likely to believe that he was subject to restraints on his freedom of the degree associated with formal arrest. Thus, prior to his arrest, Defendant was not in custody for the purposes of *Miranda*.

Because Defendant was not in custody prior to his arrest, when he said it was his "first time," the Pre-Arrest statement made in the private search area was not the product of custodial interrogation. Defendant's motion to suppress his Pre-Arrest Statement is therefore denied.

### ii. Post-Arrest Statement was not the product of custodial interrogation

There can be no dispute that Defendant was in custody once he was formally placed under arrest for importation of narcotics into the United States, informed of his arrest, and restrained with handcuffs. *See Newton*, 369 F.3d at 676 ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police — in other words, that he was . . . in custody."); *United States v. Broughton*, 983 F. Supp. 2d 224, 231 (E.D.N.Y. 2013) (finding defendant who had been informed that she was "under arrest for importation of narcotics into the United States" and restrained by handcuffs was in a situation where "[a] reasonable person would understand herself to be under formal

arrest in these circumstances and thus in custody for the purposes of Miranda."), *aff'd* --- F. App'x at ---, 2015 WL 234231, at *2 (2d Cir. 2015) (finding defendant moved to private screening area at JFK was not in custody until she was placed in handcuffs and formally arrested).

The government argues that Defendant was not expressly questioned, or confronted with any actions which would amount to the functional equivalent of questioning as to constitute interrogation under *Miranda*. Defendant contends that he was subject to questioning as to the counterfeit currency, as Agent Bergman's report indicates, or to the functional equivalent of questioning as he was repeatedly confronted with evidence of his "alleged culpability and past criminal conduct," (Reply Mem. 9–10), including, presumably, the positive drug test and counterfeit currency.

In order to warrant *Miranda* warnings, a law enforcement official must engage in express questioning or its functional equivalent, involving a measure of compulsion above and beyond that which is inherent in custody itself. *Acosta*, 575 F.3d at 189 (quoting *Innis*, 446 U.S. at 301); *see United States v. Jones*, No. 13-CR-0438, 2014 WL 950025, at *3–4 (finding "basic directives of the kind often 'attendant to arrest and custody'" such as commands directing defendant to sit down, take off his hat, and not retrieve his belongings, were not the "functional equivalent" of interrogation). Included in the definition of interrogation are words or actions on the part of the police that the police officers "*should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302.

Following Defendant's arrest, as Officers Reyes and Ramos were inventorying Defendant's luggage, one of the officers noticed that some money in Defendant's possession appeared to be counterfeit. Officer Reyes testified that she commented to Officer Ramos: "This

is counterfeit." (Tr. 24:3–10, 36:10–16.)  Officer Ramos did not recall the Defendant having said anything about counterfeit currency.  (Tr. 59:10–12.)  Defendant then made the Post-Arrest Statement, indicating that he made a purchase and someone gave him the bills as change.  (Tr. 24:3–7, 36:12–16.)  Though Defendant argues that Officer Reyes's memory of events was imperfect and thus the Court should credit Agent Bergman's report, which was drafted within days of Defendant's arrest, the Court credits Officer Reyes's account of the events as she recalled them during the hearing.  Agent Bergman's notes, dated May 20, 2014, on which Agent Bergman testified that he based his report, (*see* Tr. 132:8–22, 134:3–135:14), state that "CBPO Francisco Ramos said McLean Wilson stated the counterfeit $ came to him when he was given change after buying something."  (*See* Def. Ex. A.)  Because the only indication that Defendant was expressly asked about counterfeit currency exists in a report prepared by Agent Bergman, who was not present at the time of the Post-Arrest Statement, and which report was prepared days after the incident based on notes taken the day of the incident, and which notes make no reference to Defendant being expressly questioned, the weight of the evidence leads to the conclusion that Officer Reyes did not expressly question Defendant regarding the currency.

Officer Reyes's remark that the currency she found appeared to be counterfeit did not constitute interrogation.  Viewed in light of the surrounding circumstances, remarks made in the presence of a suspect can be the "functional equivalent" of express questioning if the officer should have known that the suspect would be moved to make an incriminating response.  *Innis*, 446 U.S. at 302–03 (finding that brief conversation between patrolmen was not functional equivalent of questioning when there was nothing to suggest that the police knew that the suspect was susceptible to the subject matter of their conversation, nothing suggested that the suspect was unusually disoriented or upset, and nothing suggested the remarks were designed to elicit a

response); *United State v. Manigault*, 111 F. App'x 37, 38 (2d Cir. 2004) (affirming finding that remarks made by one officer to another as part of a "much longer conversation" that were not directed to defendant and not intended by the officer to elicit an incriminating response were not the "functional equivalent" of interrogation). Similarly, presenting evidence to a suspect may also, under certain circumstances, rise to the "functional equivalent" of express questioning. *United States v. Stroman*, 420 F. App'x 100, 103 (2d Cir. 2011) (noting that "[s]everal courts have asserted that, under certain circumstances, showing evidence to the defendant may be the functional equivalent of custodial interrogation" but declining to determine whether showing video to defendant and directing him to be quiet constituted a *Miranda* violation) (citations omitted).

There is no indication that Officer Reyes should have known her statement, pointing out that the currency was counterfeit, was likely to elicit an incriminating response from Defendant. As a preliminary matter, Officer Reyes's inventory of Defendant's belongings was not, in itself, the functional equivalent of interrogation. *See Broughton*, 983 F. Supp. 2d at 232 (holding that examining defendant's luggage for contraband in front of her was not "the type of activity that was 'likely to elicit an incriminating response'" (citation omitted)). Furthermore, there is nothing in the record to demonstrate that Officers Reyes or Ramos knew that Defendant would have been particularly susceptible to a statement that the currency was counterfeit. *Cf. United States v. Lovell*, 317 F. Supp. 2d 663, 669 (W.D. Va. 2004) (finding officers' conduct the "functional equivalent of questioning because the investigators, knowing from their investigations that the rifle had been traced to [defendant] and that [defendant] was a 'show-me' type of person, should have known that the suspect was reasonably likely to make incriminating statements when confronted with a crucial piece of evidence"). Furthermore, despite

Defendant's assertions otherwise, all three officers maintained that Defendant was not promised that confessing would help him avoid a lengthy jail sentence or otherwise promised leniency in exchange for his cooperation in light of the evidence against him. *Cf. United States v. Montana*, 958 F.2d 516, 518–19 (2d Cir. 1992) ("[The Agent's] unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted 'interrogation.'").

###### b.   Both statements made in the private screening room were voluntary

Defendant argues that even if the Pre-Arrest and Post-Arrest Statements, both made before Defendant was given *Miranda* warnings, are admissible as not having occurred during the course of a custodial interrogation, they should be suppressed as involuntary and coerced because the actions of the officers overbore Defendant's will, and Defendant felt compelled to answer the officers. (Mot. to Suppress 7–8.) He asserts that he "sat handcuffed on a bench, [as] six or more armed officers filled the room. The officers used loud voices and told [Defendant] he was in a lot of trouble . . . . They explained that if he wanted to escape a lengthy jail sentence," he needed to confess his own involvement and provide the officers with the names of any other individuals involved in the alleged offense. (*Id.* at 8.) Defendant "felt compelled to answer the officers' questions." (*Id.*) The government argues that the circumstances did not overbear Defendant's will, that Defendant voluntarily spoke with the officers, and that there was no indication that Defendant's capacity to act voluntarily was diminished in any way.

The Due Process Clause prohibits the use of confessions that are not the product of a defendant's free will. *See United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991) ("The police may use a defendant's confession without transgressing his Fifth Amendment right only when the decision to confess is the defendant's free choice." (citing *New York v. Quarles*, 467 U.S. 649, 653 (1984)). The central question in assessing whether a confession was given

voluntarily is whether the defendant's "will was overborne" at the time of the confession. *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) (citing *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011); *see also United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." (quoting *Anderson*, 929 F.2d at 99)). Whether a defendant's will was overborne is determined by examining "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Taylor*, 745 F.3d at 23–24 (quoting *Anderson*, 929 U.S. at 99)). As discussed below, all of Defendant's May 20, 2014 statements were voluntarily made.

Given the totality of the circumstances, both the Pre-Arrest and Post-Arrest Statements to the CBP officers were voluntary, as there is no indication that Defendant's will was overborne at the time he made either statement. Defendant was not faced with violence or threats of violence, and the officers consistently and credibly testified that he was not promised anything in exchange for either statement. *See Hutto v. Ross*, 429 U.S. 28, 30 (1970) (noting that an involuntary confession is one that was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." (alterations in original) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)) (internal quotation marks omitted)). Defendant asserts that he was promised leniency in exchange for information, but the evidence presented at the suppression hearing contradicts that contention. Furthermore, there is no evidence that Defendant's mental capacity was diminished, that he was ill or intoxicated, or that he was otherwise particularly susceptible to the pressures of the situation. *See Taylor*, 745 F.3d at 23–24 (mental incapacity due to drug intoxication). Finally, the testimony shows that Defendant was not tricked or otherwise coerced into making the

statements.

The weight of the evidence indicates that Defendants' pre-*Miranda* warning statements were voluntary.  Under the circumstances, they are not subject to suppression.

**III.  Conclusion**

For the foregoing reasons, the Court denies Defendant's motion to suppress the statements made in the private screening room at John F. Kennedy International Airport on May 20, 2014.

SO ORDERED:

                 s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: April 24, 2015
       Brooklyn, New York